UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

THE OLD EVANGELINE DOWNS,
L.L.C., d/b/a/ EVANGELINE                    CIVIL ACTION
DOWNS RACETRACK AND CASINO

VERSUS                                       NUMBER 06-209-FJP-SCR

REEL GAMES, INC. AND
MIKOHN GAMING CORPORATION

**WRITTEN REASONS FOR RULING ON MOTIONS FOR SUMMARY JUDGMENT**

This matter is before the Court on a series of motions for summary judgment. Reel Games, Inc.'s ("Reel Games"), the defendant/counter claimant, has filed a Motion for Summary Judgment on the main demand asserted by the Plaintiff, The Old Evangeline Downs, L.L.C., d/b/a Evangeline Downs Racetrack and Casino (hereinafter "plaintiff" or "Evangeline Downs"). Reel Games has also filed a motion for summary judgment on its counterclaim for damages.[1] Evangeline Downs has filed oppositions to the motions.[2] The Court heard extensive oral argument on the motions. For the reasons which follow, Reel Games' Motion for Summary Judgment on plaintiff's main demand is GRANTED, and Evangeline Downs' suit against Reel Games is dismissed with prejudice. Reel Games' Motion for Summary Judgment on its counterclaim against Evangeline Downs

---

[1] Rec. Doc. No. 71.

[2] Rec. Doc. No. 76.

Doc#45462                                    1

for damages is DENIED.

**I.   Factual Background**

Reel Games, which is located in the state of Florida, is in the business of acquiring used gaming devices, then reconditioning them, and supplying casinos with the refurbished devices. In 2003, Evangeline Downs and Mikohn Gaming Corporation ("Mikohn") entered into an agreement whereby Evangeline Downs purchased refurbished gaming devices which were to be supplied by Reel Games, with Mikohn acting as the intermediary in the sale. This agreement was reduced to writing in a document entitled "Purchase Agreement" ("Agreement"). Pursuant to this Agreement, 471 gaming devices were to be sold to Evangeline Downs at a price of $931,800.00. Reel Games intervened as a party to this Agreement which was signed by all the parties in late 2003.

Reel Games contends it intervened in the Purchase Agreement solely as the supplier of the gaming devices and was only responsible under Exhibit B to the Agreement for any warranty work which may be required on the machines. The Agreement also required two Reel Games technicians to be on site at the customer's premises for one week at no cost to the customer. The Agreement also expressly provided that each party was responsible for compliance with all applicable federal, state, and local laws during the term of the Agreement.

The Agreement contained an integration clause, establishing

that it constituted "the entire agreement between the parties and that no other representations, written or oral, shall be binding."[3] The parties agreed that the Agreement could not be modified or altered unless done in writing and executed by the parties.[4]

On August 25, 2004, the Casino Gaming Section of the Louisiana State Police cited Evangeline Downs for a number of gaming regulatory violations, all of which resulted from the operation of the electronic gaming devices in play on its casino floor. The Significant Action Report ("SAR") issued by the State Police detailed each offense by Evangeline Downs during its operation of the devices. Evangeline Downs was cited by the State Police for the following violations: offering ten machines for play that were never entered into Evangeline Downs' central computer; having fourteen other machines which were found to have been on the floor for months prior to being entered into the computer; having fourteen slot machines that had been "re-keyed" by Evangeline Downs personnel without an accompanying entry in the machine log books along with four other slot machines which contained incomplete log entries; having six machines on the floor being offered for "live play" though they had not been state tested and approved; having two machines on its floor which contained storage media which was

---

[3] Rec. Doc. No. 71, Exhibit A-1, Paragraph 24 of Purchase Agreement.

[4] *Id.*, Paragraph 19 of Purchase Agreement.

not properly sealed with the state division's security tape and one other slot machine on the floor that had been sealed with security tape from Mississippi; and finally, having a machine on the floor with the main door open and tokens filling the machine's coin hopper.

In its motion for summary judgment Reel Games contends all of these violations concerned the operation or offering of the devices for play on the casino floor. Reel Games further contends it is undisputed that it had no authority to hire, train, evaluate, monitor, discipline, or fire employees of Evangeline Downs. Evangeline Downs was initially assessed penalties of approximately $462,500.00 but eventually settled this claim with the State for $150,000.00. Reel Games was not assessed any regulatory violations.

The record shows that in a 2004 letter to the Louisiana State Police, Evangeline Downs admitted its responsibility for the regulatory violations which had been charged against it. In this letter, Evangeline Downs' Director of Compliance placed full responsibility for the violations on its own employees and ultimately terminated the personnel whom it held responsible for the violations. This settlement between the State Police and Evangeline Downs was ultimately approved. It is important to note that the settlement documents make no reference to any negligence, error, or misconduct on the part of Reel Games.

In January of 2005, Mikohn, Evangeline Downs, and Reel Games entered into a Mutual Release Agreement to settle all outstanding claims under the 2003 Purchase Agreement. Reel Games claims that at that time, Evangeline Downs still owed Reel Games $241,038.00 on the $931,800.00 purchase price of the refurbished devices. Under the Mutual Release Agreement, Evangeline Downs agreed to return 68 "WMS 550" machines in exchange for Reel Games releasing Evangeline Downs from the outstanding balance owed on the purchase price under the 2003 Purchase Agreement.

The settlement between Evangeline Downs and the State Police was completed in January of 2006. One month later, Evangeline Downs filed this suit against Reel Games and Mikohn alleging the penalties it paid to settle the compliance action were caused "wholly or in part" by the negligence, error, or misconduct of Reel Games and/or Mikohn. Evangeline Downs claims the 2003 Purchase Agreement imposed certain contractual duties upon Reel Games to ensure compliance with Louisiana Gaming Laws during the installation and or operation of the devices on the casino floor. Thus, Evangeline Downs seeks to have Reel Games reimburse it for penalties it paid in excess of $22,500.00.

The Court now turns to a discussion of the parties' claims and the applicable law and facts of this case.

**II.  Law and Analysis**

    **A.  Summary Judgment Standard**

Summary judgment should be granted if the record, taken as a whole, "together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[5] The Supreme Court has interpreted the plain language of Rule 56(c) to mandate "the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."[6] A party moving for summary judgment "must 'demonstrate the absence of a genuine issue of material fact,' but need not negate the elements of the nonmovant's case."[7] If the moving party "fails to meet this initial burden, the motion must be denied, regardless of the nonmovant's response."[8]

If the moving party meets this burden, Rule 56(c) requires the nonmovant to go beyond the pleadings and show by affidavits, depositions, answers to interrogatories, admissions on file, or

---

[5] Fed. R. Civ. P. 56(c); *New York Life Ins. Co. v. Travelers Ins. Co.*, 92 F.3d 336, 338 (5th Cir. 1996); *Rogers v. Int'l Marine Terminals, Inc.*, 87 F.3d 755, 758 (5th Cir. 1996).

[6] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). See also *Gunaca v. Texas*, 65 F.3d 467, 469 (5th Cir. 1995).

[7] *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (quoting *Celotex*, 477 U.S. at 323-25, 106 S.Ct. at 2552).

[8] *Id.* at 1075.

other admissible evidence that specific facts exist over which there is a genuine issue for trial.[9] The nonmovant's burden may not be satisfied by conclusory allegations, unsubstantiated assertions, metaphysical doubt as to the facts, or a scintilla of evidence.[10] Factual controversies are to be resolved in favor of the nonmovant, "but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts."[11] The Court will not, "in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts."[12] Unless there is sufficient evidence for a jury to return a verdict in the nonmovant's favor, there is no genuine issue for trial.[13]

In order to determine whether or not summary judgment should be granted, an examination of the substantive law is essential. Substantive law will identify which facts are material in that "[o]nly disputes over facts that might affect the outcome of the

---

[9]*Wallace v. Texas Tech Univ.*, 80 F.3d 1042, 1046-47 (5th Cir. 1996).

[10]*Little*, 37 F.3d at 1075;  *Wallace*, 80 F.3d at 1047.

[11]*Wallace*, 80 F.3d at 1048 (quoting *Little*, 37 F.3d at 1075). *See also S.W.S. Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 494 (5th Cir. 1996).

[12]*McCallum Highlands v. Washington Capital Dus, Inc.*, 66 F.3d 89, 92 (5th Cir. 1995), *as revised on denial of rehearing*, 70 F.3d 26 (5th Cir. 1995).

[13]*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-51, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

suit under the governing law will properly preclude the entry of summary judgment."[14]  The Court now turns to a discussion of the parties' claims.

**B.   The Purchase Agreement**

Evangeline Downs contends that under the 2003 Purchase Agreement, Reel Games was obligated to ensure regulatory compliance with Louisiana Gaming Laws during the installation and set up of the gaming devices.  Evangeline Downs contends that since the 2003 Purchase Agreement requires Reel Games to have two technicians on site for one week supports its argument that Reel Games was responsible for regulatory compliance.  It contends there would be no reason for technicians to remain on site except if they were required to assist Evangeline Downs with the installation and operational aspects of the machines in accordance with the Louisiana gaming laws.  Evangeline Downs also claims that industry custom requires the vendor of gaming machines to assist in the set-up and testing of machines in order to ensure proper installation, operation, and regulatory compliance.  Evangeline Downs argues that it relied on Reel Games' expertise, and it was the negligence of Reel Games that caused Evangeline Downs' non-compliance and regulatory fines in violation of Paragraph 11 of the Purchase Agreement.  This provisions states:

---

[14]*Id.* at 248, 106 S.Ct. at 2510.

> 11. **Independent Contractor.** *If* this agreement covers services, Seller shall act as an independent contractor in providing all such services, and shall have full control of the work involved in the work site, including the duty to supervise all workers, and comply with all the laws and regulations concerning their work.[15]

Evangeline Downs also claims that Reel Games violated the warranty clause of the Purchase Agreement in paragraph 7 by delivering gaming devices sealed with a Mississippi gaming tape. In summary, Evangeline Downs argues that paragraphs 7 and 11 of the Purchase Agreement are ambiguous as to whether Reel Games was required to ensure compliance with applicable gaming regulations.

In response to Evangeline Downs' arguments, Reel Games contends the technician requirement in the Purchase Agreement does not support Evangeline Downs' position because there is other language in the Purchase Agreement which expressly provides that each party will be responsible for its own regulatory compliance. According to Reel Games, the Purchase Agreement also limits Reel Games' obligations to repair or replace the devices.[16] Reel Games also argues that the time period of one week in the Agreement does not necessarily correspond with the time it would take to satisfy the applicable gaming regulations required of Evangeline Downs. Reel Games further contends that the independent contractor

---

[15]Rec. Doc. No. 71, Exhibit A-1, p. 2 of Purchase Agreement.

[16]Rec. Doc. No. 71, Exhibit A-1, p. 2, ¶ 10; p. 4, ¶¶ 22 and 23; Exhibit B, p. 8.

provision is inapplicable because it begins, "[i]f this agreement covers services," and the agreement, when read as a whole, reflects a sale of goods only.  Finally, Reel Games contends there is no ambiguity in the Purchase Agreement, and the Court should give the words in the Purchase Agreement their fair meaning under general contract interpretation principles.

Under Louisiana law, a contract is "the law between the parties, and is read for its plain meaning."[17]  Thus, "'[u]nder Louisiana law, where the words of a contract are clear and explicit and lead to no absurd consequences, the contract's meaning and the intent of its parties must be sought within the four corners of the document and cannot be explained or contradicted by extrinsic evidence,' such that, '[i]f a court finds the contract to be unambiguous, it may construe the intent from the face of the document - without considering extrinsic evidence - and enter judgment as a matter of law.'"[18]  Further, "[u]nder Louisiana law, "a contract is ambiguous when it is uncertain as to the parties' intentions and susceptible to more than one reasonable meaning under the circumstances and after applying established rules of

---

[17]*In re Liljeberg Enterprises, Inc.*, 304 F.3d 410, 439 (5th Cir. 2002)(citations omitted).

[18]*Id.* at 440, quoting *Am. Totalisator Co., Inc. v. Fair Grounds Corp.*, 3 F.3d 810, 813 (5th Cir. 1993).

construction."[19]  The Fifth Circuit Court of Appeals has held that under Louisiana law, "the fact that one party can, in hindsight, create a dispute about the meaning of a contractual provision does not render the provision ambiguous.  The Court must give effect to the ordinary meaning of the words and may not create an ambiguity where none exists."[20]

After carefully reviewing the record in this case, including the Purchase Agreement, the Court finds that a plain reading of the Purchase Agreement does not obligate Reel Games to guarantee the level of regulatory compliance alleged by Evangeline Downs. Applying the law to the facts of this case, the Court cannot find any specific contract language in the Purchase Agreement which supports Evangeline Downs' position on this issue.  It appears to the Court that Evangeline Downs is attempting to shift all regulatory compliance obligations to Reel Games/Mikohn, which is an untenable and unreasonable position which would lead to absurd consequences.  It is clear from the evidence presented in this case that Evangeline Downs had the authority and indeed the responsibility to make sure the gaming devices it offered for play complied with applicable gaming regulations.  The record reveals

---

[19]*Id.*, quoting *Davis Oil Co. v. TS, Inc.*, 145 F.3d 305, 308 (5th Cir. 1998)(quoting *Lloyds of London v Transcon. Gas Pipe Line Corp.*, 101 F.3d 425, 429 (5th Cir. 1996)).

[20]*Rutgers, State University v. Martin Woodlands Gas Co.*, 974 F.2d 659, 662 (5th Cir. 1992), citing *Esplanade Oil & Gas, Inc. v. Templeton Energy Income Corp.*, 889 F.2d 621 (5th Cir. 1989).

that Evangeline Downs failed to carry out its responsibility and thus its attempt to shift the blame to Reel Games is simply not supported by the record.

The Court finds that the contract provisions as written are clear and unambiguous and do not lead to absurd consequences. Therefore, the Court finds the provisions must be given their ordinary meaning and, in doing so, the Court finds the provisions are not subject to more than one reasonable interpretation.

### C.   The Mutual Release Agreement

Even if the Court should find that Evangeline Downs' interpretation of the Purchase Agreement was correct, the Court finds the 2005 Mutual Release Agreement was prospective only, and only covers liability for acts from the date of its execution forward.

Evangeline Downs argues that under the 2005 Mutual Release Agreement, Reel Games is liable to Evangeline Downs for the $150,000.00 which Evangeline Downs paid in gaming penalties, minus $22,500.00.  Evangeline Downs contends it is entitled to recover the $150,000 because the penalties were the result of the negligence, error, or misconduct of Reel Games or Mikohn. Evangeline Downs also claims that even though it admitted fault in the settlement it made with the State Police, that has no bearing on the liability between itself and Reel Games.  Evangeline Downs contends the existence of the Mutual Release Agreement is

sufficient evidence of the intent of the parties because both parties were well aware of the pending regulatory issues, and that if "who paid the fine" was the end of the inquiry, the issue of indemnity would never arise.

In response to Evangeline Downs' arguments, Reel Games contends the 2005 Mutual Release Agreement was absolutely intended to cover future events because it included specific language which stated the release agreement was to be "[e]ffective from and after the date hereof."[21]  This is particularly so because the SAR issued to Evangeline Downs addressed violations committed by Evangeline Downs which pre-dated August 2004.  For this reason, Reel Games argues that at the time the Mutual Release Agreement was signed, Evangeline Downs already had specific knowledge of every individual violation asserted against it by the State Police as set forth in the SAR.  However, Evangeline Downs contends the penalties for the violations had not been imposed at the time the Mutual Release Agreement was executed and the release still covered liability for those penalties at issue.

On the other hand, Reel Games contends the parties released all claims between each other arising out of the Purchase Agreement, except for only a limited exception: the parties preserved claims for future penalties assessed by the gaming

---

[21]Rec. Doc. No. 71, Exhibit A-2, p. 1 of Mutual Release Agreement.

authorities against any party resulting from negligence, error, or misconduct on the part of Mikohn and/or Reel Games.[22]  Reel Games claims the Mutual Release Agreement does not make it responsible for or preserve any claims for penalties resulting from the negligence, error, or misconduct **on the part of Evangeline Downs**.  Reel Games also argues the evidence shows the regulatory violations giving rise to the penalties at issue were operational in nature since the violations resulted from the devices being placed on the casino floor and offered for play.  Reel Games further claims it is undisputed that it had no contractual or legal authority to make operational decisions.  The decision to place the gaming devices on the casino floor and offer them for play was solely that of Evangeline Downs.  Reel Games further contends the Mutual Release Agreement does not make Reel Games responsible for or preserve any claims on the basis of partial or comparative negligence, neither does it refer back to the violations set forth in the August 25, 2004 SAR or the penalties associated therewith.  The Court agrees.

The Court finds that the only event occurring after the execution of the Mutual Release Agreement was the settlement between Evangeline Downs with the State of Louisiana.  There is no

---

[22]Mutual Release Agreement, Exhibit A-2 to Affidavit of Brian Smith, Rec. Doc. No. 71: "Effective from and after the date hereof, ... any fines imposed on Mikohn, Reel Games, or Evangeline Downs over $22,500 that are as a result of the negligence, error, or misconduct of Mikohn AND/OR [Reel Games], shall be the responsibility of [Reel Games]."

summary judgment type evidence that, prior to the payment of the $150,000.00 settlement at issue in this case, Evangeline Downs ever took the position that the violations described in the August 2004 SAR were caused by the negligence, error, or misconduct of Reel Games.

The Court also agrees with Reel Games' contention that liability for violations and penalties listed in the August 2004 SAR could have easily been included in the 2005 Mutual Release Agreement had they been intended to be covered under such agreement.  This is particularly so since the record shows that Evangeline Downs had all of the necessary information at that time to specifically include any violations it deemed the fault of Reel Games in the Agreement.  The Court further finds that the Mutual Release Agreement does not mention any of the violations and penalties from the August 2004 SAR, does not identify Reel Games or Mikohn as being liable for such violations and penalties, and was effective only from the date of its execution forward.

The Court's holding is supported by the Louisiana law of contract interpretation which was previously set forth herein to the facts surrounding the Mutual Release Agreement.  Nothing in the Mutual Release Agreement shifts responsibility for penalties which Evangeline Downs would seem to arbitrarily determine are the result of the negligence, error, or misconduct of others.  The limitation of the Mutual Release Agreement must be given meaning, and must be

interpreted with the meaning which best conforms to the object of the contract.[23]  Because the object of the contract was to shift responsibility for "fines imposed" and because the parties did not refer to the violations in the August 2004 SAR, it would be unreasonable for the Court to interpret the Mutual Release Agreement to shift responsibility for penalties arising out of the August 2004 SAR.  Had the parties intended to require Reel Games to pay for the violations in the August 2004 SAR, the parties would have and should have included this language in the Agreement and should not have stated the Agreement was to be "effective from and after the date hereof."

For the reasons set forth above, the Court finds that there are no genuine issues of material fact which preclude the Court from granting summary judgment in favor of Reel Games on the claims brought by Evangeline Downs.  Therefore, the Court finds Reel Games' motion for summary judgment should be granted as a matter of law under the facts of this case.

**D.   Reel Games' Motion for Summary Judgment on Counterclaim**

Reel Games has also moved for summary judgment on its counterclaim against Evangeline Downs, which is based on the return of certain gaming devices that were the subject of the 2003 Purchase Agreement.  Reel Games alleges that according to the Mutual Release Agreement, Evangeline Downs was to return a

---

[23]*See* La. C.C. art. 2048.

specified number of reconditioned gaming devices in the same state as described in the Purchase Agreement. Reel Games claims that because the devices were returned in an inoperable state with broken and missing parts, Evangeline Downs is liable for the cost to repair the damaged devices.

In its opposition to Reel Games' motion for summary judgment on its counterclaim, Evangeline Downs contends the evidence in the record establishes that when the devices were loaded on the transportation provided by Reel Games, they were in as good, if not better, condition than when Evangeline Downs received them. Evangeline Downs claims that at the very least, there is a material issue of fact in dispute as to the condition of the gaming devices at the time they were tendered to the shipper.

The Court has carefully considered the briefs, oral arguments of counsel, and the evidence submitted in this case. The Court finds that there are material issues of fact in dispute which preclude the Court from granting summary judgment on Reel Games' counterclaim. Therefore, Reel Games' summary judgment on its counterclaim is denied.

### III. Conclusion

For the reasons set forth above, the motion for summary judgment by Reel Games on the main demand of Evangeline Downs is granted, and Evangeline Downs' claims against Reel Games are dismissed with prejudice. The Court denies Reel Games' motion for

summary judgment on its counterclaim, finding that there are genuine issues of material fact in dispute regarding this claim.

A pretrial conference in this case is set for January 29, 2009, at 11:00 a.m.  The parties shall comply with the deadlines and provisions set forth in the Uniform Pretrial Notice filed on October 27, 2008.

IT IS SO ORDERED.

Baton Rouge, Louisiana, October 31, 2008.

FRANK J. POLOZOLA
MIDDLE DISTRICT OF LOUISIANA

Doc#45462